UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT GREENEVILLE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | No. 2:05-CR-19 |
| V. ) | District Judge Greer |
| ) | Magistrate Judge Inman |
| ROBERT A. J. VALESQUEZ, JR. ) | |

**REPORT AND RECOMMENDATION**

On August 7, 2003, defendant and his co-defendant Zozaya had airline tickets to fly from Lambert/St. Louis Airport to Phoenix, Arizona. While at the St. Louis Airport, DEA-Drug Task Force agents administratively seized $12,000 in cash from defendant, and $25,850 from Zozaya. Defendant has filed a motion to suppress evidence of the cash seized from him, as well as statements regarding the source of the cash made by him to the drug task force agents. [Doc. 52.] The motion was referred to the Magistrate Judge pursuant to the standing order of the Court and 28 U.S.C. § 636.

An evidentiary hearing was held on January 12, 2006. The only witnesses were Special Agent Paul Robinson of the Drug Enforcement Agency ["DEA"], and the defendant.

There are three types of police-citizen encounters that involve, or potentially involve, the Fourth Amendment to the Constitution. First, there is what may be described as the "mere encounter" in which the police officer approaches a citizen in a public place and asks if the citizen is willing to answer some questions. The citizen may or may not answer those

questions as he pleases, and "[h]e may not be detained even momentarily without reasonable, objective grounds for doing so . . . ." In such a "mere encounter," the Fourth Amendment does not come into play at all. *Florida v. Royer*, 460 U.S. 491, 497 (1983). In the second type of police-citizen encounter, the citizen may be *temporarily* detained, i.e., seized, if there is an articulable suspicion that a person has committed or is about to commit a crime. This, of course, is a *Terry* stop.[1] A reasonable suspicion of criminal activity, although not rising to the level of probable cause, will justify a temporary detention for the purpose of questioning limited to the purpose of the stop. *Id.*, 498. The investigative detention must be temporary and last no longer than necessary to effectuate the purpose of the stop. *Id.,* 500. The burden is upon the government to demonstrate that the duration and scope of the investigative detention was sufficiently limited. *Id.* Any statements made during a period of illegally extended detention are inadmissible even though otherwise made voluntarily. *Id.*, 501.

A seizure occurs when a reasonable person would believe that he was not free to leave. *United States v. Mendenhall*, 446 U.S. 544 (1980). The Supreme Court subsequently defined a "reasonable person" as a "reasonable *innocent* person." *Florida v. Bostick*, 501 U.S. 429 (1991).

The third type of police-citizen encounter is an actual arrest which, of course, must be based on probable cause. *See, e.g., United States v. Flowers*, 909 F.2nd 145 (6th Cir. 1990).

Thus, this Court must determine whether this was just a "mere encounter," or if there

---

[1]*Terry v. Ohio*, 392 U.S. 1 (1968).

2

Case 2:05-cr-00019-JRG-MCLC   Document 63   Filed 01/19/06   Page 2 of 12   PageID #: 6

was a seizure. If there was a seizure, the Court must then determine if the seizure was a temporary investigative one falling within the ambit of *Terry v. Ohio*, or a full-blown arrest, requiring probable cause and *Miranda* warnings. If the latter, then defendant's motion to suppress should be promptly granted since the government does not claim there was probable cause at the outset to seize either defendant or his money, and the government similarly concedes that defendant was never advised of his constitutional rights. But if the former, i.e., that this was a temporary investigative detention, then the Court must further determine if the investigative detention was justified under *Terry v. Ohio* and its progeny, *and* if it was sufficiently limited in scope and duration to remain a valid *Terry* stop.

Only two witnesses testified at the suppression hearing, DEA Agent Robinson, and the defendant Valesquez. The chronology of events is *critically* important in this case, and the duration of each event as it occurred is even more so. No criticism is intended, but the Court notes that the testimony of both Robinson and defendant was somewhat haphazard at various points, and in some instances the time or duration of an event was not addressed at all. For this reason, the Court took the rather unusual step of ordering a transcript of the hearing, which is in the custody of the Clerk. With the foregoing as a preamble, the Court makes the following factual findings:

On August 7, 2003, the defendant Valesquez and his traveling companion, Daniel Zozaya (a co-defendant), were scheduled to fly out of Lambert/St. Louis Airport at approximately 6:30 p.m. Before entering the terminal from which their flight was to depart,

defendant and Zozaya were required to go through the usual screening procedures and devices operated by the Transportation Security Administration ["TSA"]. During the course of the screening procedures, the TSA personnel noted that both Valesquez and Zozaya were carrying large sums of cash. Having no weapons or other prohibited contraband on their persons or in their carry-on luggage, defendant and Zozaya were allowed to proceed into the terminal. However, the TSA personnel immediately called the Drug Enforcement Agency, which maintained a permanent presence in the airport, and reported to that agency that defendant and Zozaya has large sums of cash on their persons. The DEA Agent was Paul Robinson. Possession of large sums of currency, of course, is reasonably calculated to generate suspicion of narcotics trafficking.

It is at this point the first of several irreconcilable disputes in the proof arises. Agent Robinson testified that he received the call from the TSA staff regarding defendant and Zozaya at 7:10 p.m., that he and two other agents established surveillance of Zozaya and defendant at 7:20 p.m., and began talking to defendant and Zozaya at 7:45 p.m. Defendant, on the other hand, testified that he was initially approached by Agent Robinson and two other officers between 5:45 and 6:00 p.m.

According to Agent Robinson, he and another officer approached *both* defendant and Zozaya at 7:45 p.m., whereas defendant asserts that he never was questioned or interviewed by Agent Robinson in the presence of Zozaya.

According to Agent Robinson, he approached the defendant and Zozaya and merely

4

asked them if they would agree to answer some questions, and that both men answered affirmatively. Robinson and the other agents were dressed in civilian clothes; nevertheless, according to Robinson, he asked defendant and Zozaya if they would prefer stepping over into a stairwell, since it was somewhat secluded and out of the public eye. Robinson testified that Zozaya and defendant stated that they would prefer to step into the stairwell, which they did. Once in the stairwell, Robinson asked them about their travel plans, and looked at their tickets which reflected their flight was to leave at approximately 10:00.

Defendant's testimony is far different. According to him, he and Zozaya went to Chili's Restaurant to eat a meal while awaiting the call of their 6:30 flight. It is again noted that defendant asserts that he was initially approached by the officers between 5:45 and 6:00 p.m. According to defendant, while he and Zozaya were eating in Chili's Restaurant, they heard an announcement over the public address system that their flight to Phoenix had been canceled and that passengers on that flight should report to the airline counter for instructions. Defendant got up from the restaurant table and immediately went to the airline counter and secured tickets for a 9:30 flight to Phoenix. He returned to the table and suggested to Mr. Zozaya that he should go to the airline counter and tend to his business. Zozaya did so and defendant sat down at the table to resume his meal. According to defendant, he was using his cell phone – a "flip" cell phone – and began wondering what was keeping Zozaya, since he had been gone a unusual length of time. As he looked out into the hallway from the restaurant, he noticed two men, one white and one black, enter the restaurant. Although both

5

were dressed in plain clothes, the white man (now known to be Agent Robinson) had a badge pinned to his shirt. The two men came up to defendant's table, one standing on either side of him. Defendant testified that Robinson asked him, "are you going to run?", and placed a hand on his shoulder. More or less at the same, the black officer reached over and closed defendant's cell phone. Defendant went on to testify that Agent Robinson asked him, "are you Robert Valesquez?", to which defendant responded, "yes, sir." The black officer then asked defendant if he "was the one that was convicted of armed robbery and that had the restraining order against him?", again to which defendant answered "yes." Defendant testified that Agent Robinson told him to stand up, while at the same time the black officer picked up defendant's carry-on bag; they then escorted defendant down a stairwell to a lower level of the airport where there was an unidentified office of some sort. According to defendant, he still had not seen Mr. Zozaya since Zozaya left him to go pick up his new ticket.

Agent Robinson testified that he, the other agents, defendant and Zozaya stayed in the stairwell approximately ten minutes, that during that ten minutes Robinson asked their travel plans, viewed their tickets, etc. Robinson stressed that both the defendant and Zozaya were free to go at any time, and if they had elected to do so, their movement would not have been impeded by the officers in any way. When defendant, Zozaya, and the agents arrived at the office on the lower floor, it was determined that Zozaya had $25,850 on his person, and defendant had $12,000 in cash on his person. Robinson testified that he asked both men regarding the source of the money, and both of them gave strained and obviously contrived

6

stories about selling a rare automobile on behalf of a person in Phoenix whose name the men could not remember, to a woman in Springfield, Missouri, whose name the defendants could not remember. At that point, Robinson advised the two men that the money was drug money and that he was administratively seizing it.

Again, defendant's chronology of these events is rather different. He testified that he alone was initially approached at approximately 6:00 p.m. and then was escorted straightaway downstairs at approximately 6:30 p.m., meaning that he was questioned by the agents at or near the Chili's Restaurant for nearly thirty minutes. When he arrived downstairs, he stood outside the office for approximately five minutes, at which time a St. Louis canine police officer, accompanied by the dog, entered the office. It is noted that Agent Robinson no where mentioned a drug dog. Defendant testified that he continued to wait outside the office pursuant to Agent Robinson's instructions for approximately thirty minutes, after which Zozaya came out of the office which would be, according to the defendant, the first time he had seen Zozaya since Zozaya had left Chili's Restaurant to procure new airline tickets. When Zozaya exited the office, the drug dog by that time had sniffed defendant's bag, the money, and other personal effects, and reacted positively. The money was thereupon seized.

By way of repetition, Agent Robinson testified that he first approached both men at 7:45 p.m. and (by extrapolation) everyone went downstairs within the next fifteen to twenty minutes. Significantly, Robinson never testified regarding the time the money was seized and the questioning ended. Defendant testified that he alone was first approached at 6:00 p.m.,

7

that he was taken downstairs between 6:30 and 7:00 p.m., that the entire process lasted until approximately 9:30 p.m.; indeed, defendant testified that he and Zozaya missed their 9:30 flight due to the length of the process.

It is impossible to escape the conclusion that this was not a "mere encounter." No reasonable, innocent person would believe that he was free to leave under the circumstances described herein. The agents knew who defendant was, and they knew about his criminal history. One of the agents peremptorily closed defendant's cell phone; Agent Robinson placed a hand on defendant's shoulder; he asked defendant if he intended to run; he asked defendant to accompany him to another and more secluded part of the airport; another agent picked up defendant's bag and carried it; and Robinson never told defendant that he was free to leave. A reasonable person, who was the object of such statements and actions by law enforcement agents, would not assume that he was free to leave; indeed, that person reasonably would believe quite the contrary. Thus, defendant was "seized."

Without a doubt, Agent Robinson had a reasonable and articulable suspicion that defendant and Mr. Zozaya had engaged in criminal activity by virtue of having nearly $38,000 in cold cash on their persons. It is conceded that possession of large sums of currency does not *per se* constitute probable cause to believe that the money was derived from illegal activity; but in this day and time at the very least it raises a reasonable *suspicion* that the money was derived from drug trafficking. Agent Robinson's investigative detention of defendant was justifiable under the Fourth Amendment and *Terry v. Ohio*.

Thus, the inquiry must move one step further: Was Agent Robinson's investigative detention sufficiently limited in scope and duration to remain a valid *Terry* stop? The Supreme Court steadfastly has refused to establish any definitive or bright-line time limit for *Terry* stops. *United States v. Place*, 462 U.S. 696, 709 (1983). The investigative detention must "last no longer than is necessary to effectuate the purpose of the stop . . . [and] . . . the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Royer*, *supra*, at 500. Of course, as regards currency, the investigating officers have few tools at their disposal. To be sure, the officers may ask the detainee to explain why he has large sums of currency on his person, and the source of those funds. What if the detainee simply refuses to answer or, as defendant did here, fabricates an explanation? Lying about the source or purpose of the money ultimately might generate probable cause, but what if it takes an extended period of time to confirm the truth or falsity of the suspect's statements, bearing in mind that the *Terry* "clock" is ticking all the while? Refusing to answer will not create probable cause. So what other device is left to the officers to confirm or dispel their suspicions of criminal activity? For better or worse, the answer seems to be, drug dogs. *See, e.g., Royer, supra,* at 505-6 ("if [drug dogs] had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out."); *Place, supra*, at 705-6 ("[t]he police may confine their investigation to an on-the-spot inquiry – for example, immediate exposure of the luggage to a trained narcotics detection dog . . . ."); *United States v. Knox*, 839 F.2d 285, 291

(6th Cir. 1988) ("[w]e observe that the investigation was expedited through the presence of the drug-sniffing dog at the time of defendants' detention . . . .") "Diligence" is the operative word as far as the length of a *Terry* detention is concerned; if the officers acted diligently to confirm or dispel their suspicions, then a *relatively* lengthy investigative stop is valid. *See, e.g., United States v. Sharpe*, 470 U.S. 675, 686 *et seq.* (1985). As just discussed, in the case of suspect currency, the *prompt* use of a drug dog seems to be important as far as "diligence" is concerned.

As referenced earlier, there are a number of irreconcilable discrepancies in the testimonies of Agent Robinson and the defendant Valesquez. Resolving those disputes has been an extremely difficult task, since the only evidence presented at this hearing was the testimony of these two witnesses. Of course, the Court has the testimony of a DEA agent opposed to the defendant, who admittedly is a convicted felon. Nevertheless, defendant's testimony was so detailed (to the extent that he supplied details, which even Agent Robinson did not address) that the Court is constrained to resolve the discrepancies in favor of defendant. Thus, defendant was approached by the officers at 6:00 p.m., not 7:45 p.m. Frankly, this makes more sense; it must be assumed that Valesquez came to the airport in time to catch his *first* flight, which left at 6:30. This means that he likely would have gone through the TSA screening process at 5:00 or 5:30 p.m., and that the TSA would have placed its call to the Drug Task Force Agency around that same time. Robinson testified that he commenced his surveillance at 7:15. If that is so, it necessarily follows that defendant and Zozaya would

have been long gone since their original flight was scheduled to leave at 6:30. The Court also credits completely defendant's testimony regarding the manner in which Agent Robinson and the other officer approached him; as far as a "reasonable person" is concerned, defendant was "seized." The Court believes Mr. Valesquez's testimony that he was taken downstairs at 6:30 p.m., and that the dog sniff occurred at 6:35 p.m. Therefore, between the initial contact and the dog sniff, no more than thirty-five minutes had elapsed. Thereafter, defendant related his concocted story to Agent Robinson about the sale of the car which apparently consumed the remaining time, i.e., between 6:30 p.m. and 9:30 p.m. This detention persisted for 3-1/2 hours, longer than necessary to (1) listen to defendant's ridiculous tale about the source of the cash, and (2) secure a dog sniff of the money and defendant's bag. Even if Robinson's chronology is accepted, a seizure of defendant and his property occurred at 7:45 and lasted until 9:30, a period of 1-3/4 hours.

In *Royer*, the Supreme Court held "that statements given during a period of illegal detention are inadmissable." 460 U.S. 501. In *Place*, although the Supreme Court went to some lengths that it was not adopting a definitive time limit for *Terry* stops, it also said that "we have never approved a seizure of a person for the prolonged 90-minute period involved here and cannot do so on the facts presented by this case." 462 U.S. at 709-10. It also should be noted that the *Place* opinion placed great emphasis on "intrusiveness," and the diligence required of the police in pursuing their investigation. *Id.*, 709. Whether defendant's detention lasted 3-1/2 hours as defendant testified, or for only 1-3/4 hours as testified by Agent

11

Robinson, it was simply too long under the circumstances.

It is recommended that defendant's motion to suppress be GRANTED.

Any objections to this report and recommendation must be filed within ten (l0) days of its service or further appeal will be waived. 28 U.S.C. § 636(b)(1)(B) and (C). *United States v. Walters*, 638 F.2d 947-950 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985). The objecting party shall procure and file simultaneously with the objections a transcript of any testimony before the Magistrate Judge. If a transcript is not filed simultaneously with the objections, the party filing the objections shall either (1) file a declaration that the transcript was ordered before the objections were filed and the date on which the party expects the transcript to be filed, or (2) affirmatively state that a transcript of the testimony presented to the Magistrate Judge is not needed for resolution of the objections. If a party files objections to this report and recommendation, the attorney for that party shall provide a copy of such objections to the opposing counsel on the same day the objections are filed, either by hand-delivery or facsimile transmission. The opposing counsel shall file his/her response to the objections within five business days of the date the objections are filed.

Respectfully submitted,

                                        s/ Dennis H. Inman
                                       United States Magistrate Judge